# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| RSA 1 LIMITED PARTNERSHIP and IOWA RSA 2 LIMITED PARTNERSHIP, | |
| Plaintiffs and Counter-Defendants, | No. 1:13-cv-00010 |
| vs. | |
| PARAMOUNT SOFTWARE ASSOCIATES INC., d/b/a PROFESSIONAL SOFTWARE OF AMARILLO, | **ORDER** |
| Defendant and Counter-Plaintiff. | |

## I. INTRODUCTION

This case arises from termination fees assessed by Defendant/Counter-Claimant Paramount Software Associates, Inc. ("PSA") against Plaintiffs/Counter-Defendants RSA 1 Limited Partnership ("RSA 1") and Iowa RSA 2 Limited Partnership ("RSA 2") (collectively referred to as "RSAs" or the "RSA Entities"). In the RSAs' amended complaint, it is asserted that PSA breached their Outsourcing of Data Processing Agreements (the "Agreements") by imposing termination fees. The RSAs request a declaratory ruling that they are not required to pay the termination fees, and they seek attorneys' fees. In reply, PSA filed a second amended complaint, alleging the RSAs breached the Agreements by failing to pay the termination fees and requesting a monetary judgment in the amount of such fees, plus attorneys' fees.

On March 17, 2014, the RSAs sought summary judgment in their favor on their complaint and against PSA on its counterclaim. [Dkt. No. 36.] The RSAs contend that PSA is trying to enforce a liquidated damages provision that is unenforceable under both Iowa and Texas law. Additionally, the termination fees do not apply for two reasons: (1) the RSAs did not terminate the Agreements, and thus, section 12.3 of the Agreements was not triggered, and (2)

1

the fees sought by PSA do not apply to renewal terms. Finally, the RSAs argue that the amount of fees would actually be zero if calculated correctly. Thus, PSA's motion should be denied.

On April 30, 2014, PSA sought summary judgment in its favor on its breach of contract claim against the RSAs. [Dkt. No. 48.] PSA alleges that the RSAs failed to pay termination fees pursuant to section 12 of the parties' Agreements and the attorneys' fees incurred by PSA pursuant to section 38.001 of the Texas Civil Practice and Remedies Code ("section 38.001"). According to PSA, the parties' Agreements were in a renewal term when the RSAs terminated the Agreements. Thus, PSA argues, the RSAs triggered the termination fees provision in their contract. In addition, PSA seeks summary judgment dismissing the RSAs' claim for declaratory relief that the RSAs do not owe the termination fees and the RSAs' claim for attorneys' fees.

This Court grants PSA's motion for summary judgment. By doing so, it renders judgment in favor of PSA on its claim for liquidated damages and attorneys' fees. It also denies the RSAs' motion for summary judgment seeking a declaratory judgment and attorneys' fees.

## II. BACKGROUND

PSA is a Texas corporation that provides billing services to wireless communication providers. RSA Entities are limited partnerships in Iowa that provide wireless communication services to customers in Iowa. On or about March 2, 2009, PSA and the RSAs reached Agreements in which PSA agreed to provide the RSAs with billing services. Both parties are and were represented by sophisticated counsel during the negotiations and drafting of the Agreements.

The Agreements were made for an initial term of 36-months and set to expire on March 2, 2012. The Agreements also provided for automatic renewals of 24-months after the initial 36-month term, unless one of the parties notified the other of its intention not to renew within six months prior to the end of any term. Section 12.1 of the Agreements provided PSA with the ability to terminate the Agreements as a result of the RSA Entities' nonpayment. Section 12.2 of the Agreements provided the RSAs with the ability to terminate the Agreements upon "written notice" to PSA. If the Agreements were terminated, section 12.3 would be triggered, which provided termination fees were assessed in the greater of two amounts:

> A. Equal to the fees paid or accrued by the Customer [the RSA Entities] during the six (6) month period prior to the giving of notice.
> B. The total of all projected monthly fees based on the number of unexpired months remaining on the current Agreement.

[Dkt. No. 48-1 Page 4.] Two and a half years after the Agreements were negotiated, the parties were unable to agree on alternate pricing options for a renewal contract. A series of correspondence about the termination of their Agreements gives rise to the present litigation.

The first correspondence was mailed on September 19, 2011. William Simpson, the president of PSA, sent letters to the RSAs that purported to terminate the Agreements effective March 2, 2012. Replying that same day, Chat Mobility's CEO,[1] Robert Mauer, asserted that Simpson's notice of nonrenewal was ineffective, because the letter was not given six months prior to the expiration of the 36-month initial term. He claimed that it automatically renewed for an additional 24 months (i.e., an expiration date of March 2, 2014). In Simpson's response e-mail to Mauer, Simpson recognized his mistake and agreed the Agreements were renewed.

The second correspondence was an e-mail on December 19, 2011. Velma Schrader, the manager of customer services and billing at Chat Mobility, notified PSA that the RSAs switched to a company called MIND as their billing service provider. Mauer responded to Schrader's e-mail with an e-mail stating, "Excellent, well done." However, the RSAs dispute that the December 19, 2011 e-mails equate to the RSAs providing notice to terminate the Agreements. Responding to the RSAs' e-mails, Simpson reiterated the parties' correspondence from September of that year. He noted that the Agreements were in their renewal stage and not set to expire until on or about March 2, 2014. Simpson claimed that he viewed the letter as a notice of termination.

The third correspondence was delivered on January 9, 2012. In that e-mail, Mauer responded to Simpson's December 19, 2011 e-mail. Mauer's e-mail informed Simpson that Mauer did not consider his December 19, 2011 e-mail to be a notice of termination. Rather, the letter was meant merely to advise PSA of the RSAs' "tentative plans" to convert from using PSA to MIND in September/October of 2012. According to Mauer, it was merely a "prudent" gesture or "a courtesy 'expectation'" of when the RSAs' decision may occur.

Unbeknownst to PSA, the RSAs already entered a contract with MIND to take over as the RSAs' billing service provider on December 14, 2011. Additionally, as the RSAs admit in their briefs, the data conversion process from PSA to MIND concluded on December 31, 2012 for RSA 2 and on January 15, 2013 for RSA 1. [Dkt. No. 37-1 Page 5.] At the time the conversion

---

[1] Chat Mobility is the d/b/a of the RSA Entities.

3

process concluded, fourteen months were left on RSA 2's Agreement with PSA, and thirteen months were left on RSA 1's Agreement with PSA.

The fourth correspondence was sent on January 17, 2013. PSA mailed the final invoices to RSA 1 and RSA 2. The invoices included fees for prior services rendered and for the termination fees assessed under section 12.3(B) of their Agreement. PSA invoiced RSA 1 termination fees for $182,830.93.[2] PSA invoiced RSA 2 termination fees for $76,737.38.[3] The RSAs paid for the services rendered, but not the termination fees. Three months later, the final correspondence was e-mailed on April 26, 2013 by Brian Spurgeon, the general manager of Chat Mobility. Spurgeon instructed PSA "to cease your data processing services for RSA 1 Limited Partnership and Iowa RSA 2 Limited Partnership immediately." [Dkt. No. 48-1 Page 16.]

On March 25, 2013, PSA sent a demand letter to the RSAs for payment of the termination fees. The next day, the RSAs filed a complaint that PSA breached the parties' Agreements by imposing termination fees and requested a declaratory judgment that they do not owe any fees. On September 19, 2013, PSA filed an answer and counterclaim, arguing that the RSAs breached their contract by failing to pay termination fees, and PSA was entitled to termination fees and attorneys' fees. On September 25, 2013, the RSAs filed an answer to PSA's counterclaim and denied liability. The parties' motions for summary judgment followed.

### III. STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007) (citing Fed.R.Civ.P.56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323. The requirement of a "genuine" issue of fact means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In other words, the nonmoving party is not "relieved" of its "own burden of producing in turn evidence that would support a jury verdict." *Id.* at 256.

---

[2] This fee represents the average monthly invoices to RSA 1 from August 2012 to January 2013, multiplied by 13, because there were 13 months remaining on the Agreements.
[3] This fee represents the average monthly invoices to RSA 2 from July 2012 to December 2012, multiplied by 14, because there were 14 months remaining on the Agreements.

This Court "must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party." *Carraher*, 503 F.3d at 716. The nonmoving party, or party opposing a properly supported motion for summary judgment, "'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 248 (quoting Fed.R.Civ.P. 56(e)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and . . . [the rule] should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp.*, 477 U.S. at 323–24.

In this case, there is no genuine issue of material fact for trial because the RSAs did not present evidence from which a jury might return a verdict in the RSAs' favor. *See Anderson,* 477 U.S. at 257. The undisputed facts show PSA is entitled to summary judgment in its favor on its breach of contract claim, and its dismissal of the RSAs' declaratory relief claim.

## IV. DISCUSSION

### A. Jurisdiction and Venue

This Court has jurisdiction over this action because the dispute involves citizens of different states and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. In addition, venue is proper in the Southern District of Iowa as a substantial portion of the events giving rise to the instant action occurred within the district, and the RSAs are located in the district. *See* 28 U.S.C. § 1391(g).

### B. Choice-of-Law

Section 19 of the parties' Agreements provide the following: "This Agreement shall be governed by and construed in accordance with the laws of the state of Texas." [Dkt. No. 37-1 Page 8]; [Dkt. No. 49-1 Page 4.] PSA asserts that the language from the Agreements is dispositive on which state's law applies: "There is no dispute that Texas law applies in this case." [Dkt. No. 43 Page 6]; [Dkt. No. 48-1 Page 8.]

The RSAs equivocally disagree. On the one hand, the RSAs write that "Iowa has a materially greater interest than Texas in the transactions at issue here." [Dkt. No. 49-1 Page 5.] On the other hand, the RSAs assert that determining whether Iowa has a materially greater interest than Texas "may be unnecessary because . . . there does not appear to be a material difference between the law of Iowa and the law of Texas regarding the issues raised by the parties concerning the enforceability of liquidated damage provisions." [Dkt. No. 49-1 Page 5.]

5

The one possible exception discussed by the RSAs in their brief, and at a hearing on the parties' motions for summary judgment on July 16, 2014, was PSA's argument that this Court's analysis of the enforceability of the liquidated damages clause is restricted to the four corners of the parties' Agreement. [Dkt. No. 49-1 Page 5 n.3.] If the Court were to accept PSA's interpretation of Texas's law, the RSAs argue, then the Court should apply Iowa law to prevent a violation of Iowa's public policy by enforcing a liquidated damages clause that is not a reasonable forecast of just compensation. [Dkt. No. 49-1 Page 5.] This Court disagrees.

Regardless of whether Texas or Iowa law controls the issue of whether extrinsic evidence is admissible, the result in this case will not change. The parole evidence rule in Iowa and Texas are essentially the same. In both states, if there is an integrated contract, the parol evidence rule will prevent the consideration of extrinsic evidence that modifies, supplements, or obscures the terms of an agreement. *See Americo Life, Inc. v. Myer*, No. 12–0739, 2014 WL 2789429, at *2 (Tex. June 20, 2014) (Under Texas law, "[w]hen interpreting an integrated writing, the parol-evidence rule precludes considering evidence that would render a contract ambiguous when the document, on its face, is capable of a definite legal meaning."); *see also Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 615 (Iowa 2006) (citation omitted) ("It is a fundamental and well-settled rule that when a contract is not ambiguous, we must simply interpret it as written."); *Western Reserve Life Assur. Co. of Ohio v. Bratton*, 464 F.Supp.2d 814, 831 (N.D. Iowa 2006) (citations omitted) (Under Iowa law, when a court "finds a written agreement to be fully integrated, 'the parol evidence rule prevents the receipt of any extrinsic evidence to contradict (or even supplement) the terms of the written agreement.'"); *Smidt v. Porter*, 695 N.W.2d 9, 21 (Iowa 2005) ("There are no facts in dispute which could lead a reasonable person to find that the contract was not fully integrated, and therefore the parol evidence rule bars introduction of extrinsic evidence of such promises to modify or supplement the terms of the written agreement.") Thus, the Court will give effect to the parties' choice-of-law provision and apply Texas, not Iowa, law.

**C. Standard of Review**

"Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide." *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (citations omitted). "Sometimes, however, factual issues must be resolved before the legal questions can be decided." *Id.* For example, a defendant may need to

prove the actual damages incurred to show a liquidated damages provision is unreasonable if the actual damages were far less than the amount contracted. *Id.* (citations omitted).

Texas courts will not create a liquidated damages provision for the parties; rather, "[s]uch an agreement *must be expressed*" by the parties. *See Birdwell v. Ferrell*, 746 S.W.2d 338, 340–341 (Tex. App. 1988) (citing to *Kellam v. Hampton*, 124 S.W. 970, 971 (Tex. Civ. App. 1910)). Additionally, under Texas law, "[c]ourts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." *Addicks Services, Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010) (citations omitted). In the absence of ambiguity, fraud, accident, or mistake, the parties' intent as to a written agreement that is "clear and unambiguous on its face must ordinarily be ascertained from the instrument alone," without the consideration of extrinsic evidence. *Instone Travel Tech. Marine & Offshore v. International Shipping Partners, Inc.*, 334 F.3d 423, 432–33 (5th Cir. 2003) (citation omitted). Therefore, because neither party alleges the Agreements were ambiguous, fraudulent, accidental, or mistaken, this Court is confined to review the Agreements themselves to determine if the termination fees are enforceable. *Id.*

### D. Whether Termination Fees are Enforceable

In *Phillips v. Phillips*, the Texas Supreme Court stated a two-part test to determine whether to enforce a liquidated damages provision: "[T]he court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Phillips*, 820 S.W.2d at 788 (citation omitted); *see also Stewart v. Basey*, 150 Tex. 666, 669 (Tex. 1952). The evidence regarding the difficulty of estimating damages and the reasonableness of the forecast of damages is viewed as of the time the contract was executed. *Baker v. International Record Syndicate, Inc.*, 812 S.W.2d 53, 55 (Tex. App. 1991) (citation omitted).

"If either element is lacking, the liquidated damages clause is unenforceable." *Polimera v. Chemtex Environmental Laboratory, Inc.*, No. 09–10–00361, 2011 WL 2135062, at *4 (Tex. App. May 19, 2011) (quoting *Arthur's Garage, Inc. v. Racal–Chubb Sec. Sys., Inc.*, 997 S.W.2d 803, 810 (Tex. App. 1999)). If both prongs of the *Phillips* test are met, the liquidated damages clause "will bind the parties and furnish the measure of damages." *See Birdwell*, 746 S.W.2d at 340–341. The party opposing the enforcement of the liquidated damages clause has the burden to prove the termination fees are unenforceable penalties. *Fluid Concepts v. DA Apartments*

*Ltd.*, 159 S.W.3d 226, 231 (Tex. App. 1997) (citation omitted). Thus, the RSAs have the burden to prove the termination fees are unenforceable penalties.[4] *Phillips*, 820 S.W.2d at 788.

In *Phillips*, Texas's highest court held that the contractual provision failed to meet either prong of the two-part test. *Id*. The contractual provision set liquidated damages at ten times the amount of damages caused by the general partner's breach of the trust. *Id.* The court concluded that this type of provision—one that forces one party to pay some multiplier of the actual damage for a breach of an agreement—is "an unenforceable penalty." *Id.* at 789; *cf. Cintas Corp. v. Quevedo*, No. 04–11–00142, 2012 WL 1940642, at *4 (Tex. App. May 30, 2012) (finding plaintiff, who sued defendant for breach of contract, was entitled to liquidated damages as set forth under the contract). In addition, under Texas law, a court will declare a liquidated damages clause to be an unenforceable "penalty," and limit a party to actual damages, if the amount stipulated in the clause is shown to be disproportionate to the actual damages. *Polmera*, 2011 WL 2135062, at *5 (citations omitted).

**1. PSA's Arguments**

PSA argues the liquidated damages provision meets the first prong of the *Phillips* test because "there was simply no way to estimate damages in advance" of a breach of the Agreements. [Dkt. No. 48-1 Page 12.] This is because the number of the RSAs' Internet subscribers varied from month to month. The RSAs never suggested the damages or harm caused by such a breach "were not 'incapable or difficult of estimation.'" [Dkt. No. 48-1 Page 12.] Thus, PSA argues that the first prong of the *Phillips* test was met.

In addition, PSA contends the liquidated damages provision meets the second prong because "the termination fees are an attempt 'to estimate foreseeable losses that might result from such early termination[.]" [Dkt. No. 48-1 Page 12.] PSA further argues that taking a reasonable average from the six months prior to the termination date, and making a projection for the remaining months under the Agreements, is an "attempt to reasonably forecast the compensation PSA would have received had the RSAs not terminated the Agreements." [Dkt. No. 48-1 Page 13]; *see also Henshaw v. Kroenecke*, 656 S.W.2d 416, 419 (Tex. 1983) (finding that an amount of liquidated damages, which equated to one year's average billing, was not an unreasonable sum). Thus, PSA argues that the second prong of the *Phillips* test was met.

---

[4] PSA argues that the RSAs are estopped from challenging the termination fees, but cite no legal authority to support this contention. [Dkt. No. 48-1 Pages 18–19.]

8

Finally, PSA's President, William Simpson, gave a deposition in which he said, among other things, that the liquidated damages provision was intended to incentivize the parties not to breach their Agreements. PSA contends that Simpson's deposition testimony—testimony heavily relied upon by the RSAs—is "inadmissible extrinsic evidence." [Dkt. No. 51 Page 4.] However, even if that testimony was admissible, PSA argues that it is irrelevant. This is because the relevant facts are not what Simpson testified to at his deposition but "the actual fees charged and the formula used to compute the termination fees." [Dkt. No. 51 Page 4.] Such fees, PSA argues, are based on a reasonable calculation of PSA's losses.

**2. RSAs' Arguments**

In reply, the RSAs argue that, based on Simpson's admission as to PSA's set monthly fees, "it would appear that PSA maintains records that would allow it to calculate its losses from an early termination." [Dkt. No. 49-1 Page 7 n.5.] Moreover, the RSAs contend there is a fact issue as to the first prong of the test that precludes summary judgment in favor of PSA. Thus, according to the RSAs, the first prong of the *Phillips* test was not met.

As to the second prong, the RSAs argue that PSA ignores Simpson's admissions at his deposition that "the amount of the termination fees was *not* a reasonable forecast of just compensation." [Dkt. No. 49-1 Page 8.] The termination fees were intended as a penalty and to provide an "incentive" to deter early termination by the parties. Accordingly, the RSAs argue that the second prong of the *Phillips* test was not met.

Bolstering their argument, the RSAs contend that PSA's method of calculating the fees guarantees PSA will be overcompensated. Citing to *Phillips*, 820 S.W.2d at 788, the RSAs argue that "just compensation" under the *Phillips* test refers to the actual loss a party will sustain by a breach of a contract. [Dkt. No. 49-1 Page 12.] The problem with PSA's formula is that it is based on anticipated revenues only; it fails to account for anticipated costs. Unlike the facts in *Henshaw v. Kroenecke*, a case relied upon by PSA, PSA's formula guarantees that PSA will be overcompensated upon termination by the RSAs, and the fees were used to secure performance. Thus, because Texas and Iowa courts do not enforce liquidated damages clauses that stipulate an amount disproportionate to the actual damages, the RSAs make the case that PSA's termination fees are unenforceable.

**3. Analysis**

The RSAs have the burden of proving that the PSA's losses were not difficult to estimate and the amount of damages called for was not a reasonable forecast of PSA's losses. *Phillips*, 820 S.W.2d at 788. The RSAs failed to meet their burden.

The first prong of the *Phillips* test was addressed in one footnote in the RSAs' resistance brief. [Dkt. No. 49-1 Page 7 n.4.] The RSAs argue that it would not be difficult for PSA to calculate its losses from an early termination because PSA "maintains records." While PSA attempts to operate and maintain a profit margin, it does not have records as to each and every customer so to calculate specific losses based on the RSAs' early termination. [Dkt. No. 51 Page 3.] The number of the RSAs' Internet subscribers varied from month to month; no monthly minimum subscriber requirement existed. For these reasons, at the time the parties formed the Agreements, it was difficult for the parties to estimate the damages that would be caused by the RSAs' early termination. *Trafalgar House Oil & Gas Inc. v. De Hinojosa*, 773 S.W.2d 797, 799 (Tex. App. 1989) (citations omitted) ("There was no need for the plaintiff to allege or prove actual damages if the damages resulting from a breach were difficult to estimate accurately in advance."). In other words, the termination fees were necessary. Thus, the first prong of the *Phillips* test was met because "the harm caused by the breach [was] incapable or difficult of estimation." *Phillips*, 820 S.W.2d at 788 (citation omitted).

As to the second prong of the *Phillips* test, the language in the Agreements provides that the termination fees are an attempt "to estimate foreseeable losses that might result from such early termination[.]" [Dkt. No. 43 Page 8.] The formula in the Agreements takes an average of the six months of billing prior to the termination of the contracts and makes a projection for the remaining months under the Agreements. *See Henshaw*, 656 S.W.2d at 419 (finding liquidated damages of one year's "average monthly partnership billing" was not an unreasonable forecast of just compensation, and no mention in the formula or discussion by the court of the costs to the partnership during the same timeframe); *cf. Magill v. Watson*, 409 S.W.3d 673, 681 (Tex. App. 2013) (finding liquidated damages provision is unenforceable penalty under *Phillips* due to the multiplier aspect, and the damages provision did not attempt to forecast actual damages).

Looking at the plain language of the fees and the calculation method agreed upon by both parties in the Agreements, the fees do not appear to be an unenforceable penalty. Rather, the

plain language of section 12 of the Agreements suggests that the termination fees meet both prongs of the *Phillips* test. The early termination fee, as discussed at section 12, is:

> [T]he parties' reasonable pre-estimate of Servicer's probable loss from such early termination and represents a reasonable endeavor by Servicer to estimate foreseeable losses that might result from such early termination and provides for the payment of such amounts as liquidated damages in the event of such early termination. The early termination fee is in addition to any other amounts due thereunder.

[Dkt. No. 8-3 Page 2]; [Dkt. No. 8-4 Page 2.] The RSAs argue that because they requested "the parties" be replaced by the "Servicer" that the RSAs had "no way of knowing what losses, if any, would be sustained by PSA in the event of early termination." [Dkt. No. 49-1 Page 20.] For that reason, the RSAs argued that they "could not represent that the formula for the fees would estimate such losses." [Dkt. No. 49-1 Page 20.] Because the RSAs did not "join in PSA's" allegedly "false representation" of a reasonable forecast of just compensation, the RSAs argue that they are permitted to challenge section 12 of the Agreements, and the fees were not a reasonable forecast of just compensation. This Court disagrees.

As in *Henshaw v. Kroenecke*, the termination fees are based on a negotiated, reasonable formula. 656 S.W.2d at 419. In *Henshaw*, the Supreme Court of Texas reasoned that "[t]he amount of liquidated damages, one year's average billing, is not an unreasonable sum, but is based on a formula representing the parties estimation of the value of the business which would be taken in the event of breach." *Id.* The highest court in Texas held that the plaintiff "proved his damages as a matter of law." *Id.* at 420. Similarly, the formula to calculate PSA's losses resulted in a reasonable estimate: a monthly estimate was multiplied by the remaining months under the renewal term of the parties' Agreements. Therefore, because the formula attempts to forecast actual losses, and it uses an average billing of less than one year to calculate termination fees under section 12.3(B), it was "a reasonable forecast of just compensation" for PSA. *Phillips*, 820 S.W.2d at 788; *see also Henshaw*, 656 S.W.2d at 419. Thus, because both prongs of the *Phillips* test are met, the termination fees are enforceable.

Finally, this Court finds that Simpson's deposition testimony should be disregarded. *See Instone*, 334 F.3d at 432–33 (finding absent ambiguity, accident, mistake or fraud shown in connection with the Agreements, testimony that varies the legal effect of a writing is inadmissible); *see also Americo Life, Inc.*, 2014 WL 2789429, at *2 (citation omitted) ("A written contract must be construed to give effect to the parties' intent expressed in the text as

11

understood in light of the facts and circumstances surrounding the contract's execution, subject to the limitations of the parol-evidence rule."). To consider Simpson's deposition testimony would, in effect, "nullify the requirement that parol evidence not be used to *create* an ambiguity, but only to *resolve* an acknowledged ambiguity." *Instone*, 334 F.3d at 432–33 (citation omitted). The Agreements unambiguously provide that it is "the parties' reasonable pre-estimate of Servicer's probable loss from such early termination," regardless of Simpson's subjective views.

### E. Whether the Agreements were Terminated

Under Texas law, to determine whether a notice of termination is effective, courts focus on whether the notice is "sufficiently clear and unequivocal to clearly apprise the other party of the action being taken." *See Atlantic Banana Co. v. Standard Fruit & Steamship Co.*, 493 F.2d 555, 560, n.3 (5th Cir. 1974). "As a general proposition, a contract, indefinite as to the time of its performance, may be terminated by either party by giving notice of or doing something sufficient to indicate to the other party an intention to do so." *Hughes v. Cole*, 585 S.W.2d 865, 869 (Tex. Civ. App. 1979).

### 1. PSA's Arguments

PSA argues that the December 19 and April 26 letters terminated the Agreements pursuant to section 12.2. "It is evident from a cursory read of Velma Schrader's December 19 Letter that the RSAs informed PSA that the Agreements would terminate upon the conversion to MIND." [Dkt. No. 48-1 Page 15.] PSA focuses on the letter's "farewell" phrases and wishing PSA "much success in the future." [Dkt. No. 48-1 Page 15.] PSA also highlights that the December 19 letter met the requirements of a termination letter: it was sent from the requisite authority and it was approved by Bob Mauer, the CEO, by e-mail.

Even if the December 19, 2011 letter failed to provide sufficient notice of termination, PSA argues that Brian Spurgeon's April 26, 2013 letter unequivocally provided notice of termination. In that letter, Spurgeon, the general manager of Chat Mobility, instructed PSA "to cease your data processing services for RSA 1 Limited Partnership and Iowa RSA 2 Limited Partnership immediately." [Dkt. No. 48-1 Page 16.] According to PSA, this letter also rose to the level of giving PSA sufficient notice of RSA's intent to terminate the Agreements.

Finally, PSA contends that the plain language of the Agreements provides that the termination fees applied to *both* the initial term of the contract and any renewal terms. Contrary to the argument made by the RSAs that section 12 does not apply to the renewal terms, PSA

argues, "'This Agreement' naturally includes all provisions of the Agreement." [Dkt. No. 48-1 Page 17.] The RSAs' interpretation is improper as the parties would be unable to terminate the Agreements once in a renewal term, which is when the RSAs terminated the Agreements.

**2. RSAs' Arguments**

The RSAs argue that the record does not support the assertion that the Agreements were terminated under section 12.2 to trigger the termination fees. The RSAs rely on *BP Lubricant USA Inc. v. Jenkins Mgmt. LLC*, No. 14-09-00363, 2010 WL 4684702, at *7 (Tex. App. Nov. 17, 2010) for this proposition: "Under Texas law, termination fees can only apply if the contract is terminated pursuant to its terms." The RSAs further contend the liquidated damages provision was never triggered as the RSAs did not terminate the Agreements according to its terms.

The RSAs put controlling weight on the fact that section 12.2 requires "written notice" for a customer to terminate the Agreements. The RSAs assert that the December 19, 2011 letter informed PSA of the RSAs' intent to switch billing vendors in the future, and an April 22, 2013 letter directed PSA to stop providing services and billing. These letters, however, did not provide that the RSAs were terminating the Agreements. Unlike PSA's notice of termination that was sent to the RSAs on September 19, 2011, the word "terminate" was not used in the RSAs' correspondence to PSA. Thus, the RSAs contend, because the RSAs gave no written notice of termination, the termination fees were never triggered.

The RSAs also argue that the termination fees are not applicable as section 12 of the parties' Agreements do not apply to the renewal term. Section 1.0 of the Agreements specifically notes that the initial 36-month term of the Agreements are subject to the provisions of section 12.[5] Yet, no other language indicates that section 12 applies to renewal terms. Thus, the PSA's reliance on section 12.3 to impose termination fees for the renewal term is misplaced.

Finally, even if the termination fee provision applied to the renewal term, the RSAs assert that the calculation of the fees under section 12.3(B) would be "zero" dollars because there were no monthly minimums and no exclusivity requirements. Without such provisions, the RSAs were permitted to "simply stop using PSA as their billing vendor without terminating the Agreements and without owing PSA any further monthly fees." [Dkt. No. 37-1 Page 20.]; [Dkt.

---

[5] As indicated in the RSAs' brief, section 1.0 provides: "Subject to the provisions of Section 12 hereof, the initial term shall be thirty six (36) months. This Agreement shall automatically renew for successive twenty four (24) months [sic] terms unless either party notifies the other of intent not to renew within six (6) months before the end of any term . . ." [Dkt. No. 49-1 Page 19.]

No. 49-1 Page 17.] Even if section 12.3(B) is interpreted by this Court to allow the calculation of fees that PSA proposes, the RSAs argue, the provision would be unenforceable as a penalty.

### 3. Analysis

This Court finds that the undisputed facts show that the RSAs provided written notice of termination as required by section 12.2 of the Agreements.[6] On December 19, 2011, Velma Schrader sent an e-mail, with a letter attached, to PSA. The e-mail states: "Please read attachment regarding [the RSAs'] decision." [Dkt. No. 43-3 Page 20.] The RSAs' attached letter informed PSA that its decision was to switch billing software providers and the letter suggests that the Agreements with PSA were terminated. The letter provides, in pertinent part:

> [O]ver the past several-months [sic], Chat Mobility explored other billing providers . . . Through extensive research, *we chose MIND* . . . Our full transition to MIND and first bill run is on [sic] *scheduled to begin September-October 2012*. We will send an official notice to PSA when we want the system shut down which if [sic] probably be the beginning of 2013.

[Dkt. No. 43-3 Page 21] (emphasis added). The letter concludes with other language that shows the Agreements between PSA and the RSAs were terminated: "Personally, I would like to thank you and everyone on your team who *worked* on our account over the past years. *We wish PSA much success in the future*." [Dkt. No. 43 Page 17] (emphasis added). The December 19 letter was "sufficiently clear and unequivocal" to provide "written notice" of termination pursuant to the terms of the Agreement and section 12.2. *See Atlantic Banana Co.*, 493 F.2d at 560, n.3. The language of the letter illustrated the RSAs' intent and decision to terminate the Agreements. *See Hughes*, 585 S.W.2d at 869; *cf. Atlantic Banana Co.*, 493 F.2d 555 at 560 (finding mere "threats of termination" did not provide actual notice of termination).

Additionally, the Court is persuaded by Simpson's e-mail and PSA's brief that the December 19 letter met all the requirements of a termination letter. This is because the letter was sent by a representative of Chat Mobility, Velma Schrader. The letter was approved by Bob Mauer, the CEO, when he sent a reply e-mail to Schrader's e-mail that stated, "Excellent, well done." [Dkt. No. 43-3 Page 22.] Thus, the termination fees under section 12.3 were triggered. This case is distinct from *BP Lubricant*, a case cited by the RSAs, because the nonbreaching party sent notice of the breach to the breaching party, but failed to "terminate the agreement

---

[6] Section 12.2: "At any time after twelve (12) months from the date of this Agreement, Customer may terminate this Agreement upon ninety (90) days prior written notice to Servicer." [Dkt. No. 8-3 Page 3]; [Dkt. No. 8-4 Page 3.]

consistent with the relevant contractual provisions." *BP Lubricant USA Inc.*, 2010 WL 4684702, at *7. Here, unlike in *BP Lubricant*, the Agreements were terminated pursuant to the terms of section 12.2, which triggered section 12.3 of the Agreements.

According to PSA, the monthly minimum fees were removed from the Agreements as a professional courtesy. [Dkt. No. 43 Page 19.] The Court is not persuaded by the RSAs' contention that the termination fees would be zero dollars as there were no monthly minimums and no exclusivity requirement. The monthly minimum and exclusivity requirement provisions are not relevant. This is because the RSAs and PSA negotiated termination fees based on a reasonable formula, without monthly minimum and exclusivity clauses, and the negotiations between the parties preceded the RSAs' effective notice of its termination. Thus, it is immaterial that no exclusivity provision and no minimum provision existed.

Finally, the termination fees apply to both the initial term of the contract and its renewal terms. If it were true that only section 12 applies to the initial term of the Agreements, then neither party could terminate the Agreements once in the renewal term. As PSA argues in its brief, "The contract language does not say 'this Agreement in its entirety except for Section 12.'" [Dkt. No. 48-1 Page 17.] The RSAs' reading of section 12 is also paradoxical because, if its reading was true, neither party "would have the ability to terminate the Agreements once in a renewal term." [Dkt. No. 48-1 Page 18.] However, the RSAs terminated the Agreements during the renewal term. Thus, the RSAs reading of section 12 is incorrect.

PSA also points out that section 1.0 of the Agreements provides: "This Agreement shall automatically renew for successive twenty four (24) month terms unless either party notifies the other of intent not to renew within six (6) months before the end of any term." [Dkt. No. 43 Page 20.] This Court agrees with PSA that "[t]his Agreement" includes all provisions of the Agreement. No language in the Agreements provides that section 12 only applies to the initial term. Both parties were represented by counsel during the negotiation of the terms of their Agreements. If the parties intended to limit the application of section 12, the parties would have made it clear. Thus, this Court concludes PSA is entitled to liquidated damages under the contract. *See Cintas Corp.*, 2012 WL 1940642, at *4.

## V. CONCLUSION

For the foregoing reasons, this Court holds that the termination fees of section 12 apply and are enforceable against the RSA entities. The termination fees are not a penalty. The RSAs

unequivocally terminated the Agreements pursuant to section 12.2 of the Agreements by the correspondence delivered to PSA on December 19, 2011, and the RSAs' correspondence triggered the termination fees under section 12.3(B). The RSAs have failed to raise a genuine issue of material fact regarding PSA's breach of contract claim. Accordingly, summary judgment is granted against the RSAs. PSA is entitled to recover $182,830.93 from RSA 1 and $76,737.38 from RSA 2.[7] PSA is also entitled to reasonable attorneys' fees. The Clerk shall enter judgment accordingly.

**DATED** this 21st day of July, 2014.

_____
JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA

---

[7] Elsewhere, PSA sought to recover $182,830.96 from RSA 1 and $76,302.66 from RSA 2. These figures are different from the damages cited by PSA in its Answer and Counterclaim because of differences in a computer software used to calculate the figures. [Dkt. No. 43-3 Page 34.]

16